J-A02036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| KRISTA J. BAXTER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ELIYAHOU WENICK | : | |
| | : | |
| Appellant | : | No. 431 WDA 2021 |

Appeal from the Order Entered March 4, 2021
In the Court of Common Pleas of Warren County Civil Division at No(s):
A.D. 76 of 2021

BEFORE:  OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED:  January 28, 2022**

Eliyahou Wenick (Wenick) appeals an order of the Court of Common Pleas of Warren County (trial court) granting Krista J. Baxter's (Baxter) petition for a protection of abuse (PFA) order.  We affirm.

Wenick and Baxter are former romantic partners who had a child together (G.B.) in 2019.  On February 17, 2021, Baxter petitioned for a PFA order, seeking to limit Wenick's contact with her and G.B.  A temporary PFA order was entered to that effect on February 19, 2021, following an *ex parte* hearing.

At the hearing on the final PFA, Baxter testified to a series of interactions with Wenick which she claimed put her in reasonable fear of imminent harm,

_____

[*] Retired Senior Judge assigned to the Superior Court.

justifying a PFA order. First, she testified that in early 2019, when she and Wenick were still residing as a couple in Arizona, Wenick choked her while she was pregnant with G.H. This violent act prompted Baxter to move back to Warren County, Pennsylvania, where her parents reside.

Baxter next described an incident in late 2019 when Wenick visited her and G.H. at her parents' home. Wenick, at one point, tightly grabbed Baxter's wrists and told her that he would "kill her in court." After the incident, Baxter testified that she sought counselling and reported what happened to the police.

A third incident took place that same year, as Baxter was backing her car out of her parents' driveway. Wenick was sitting in the back seat with G.H. and discussing their respective living arrangements. Baxter testified that when the conversation between Wenick and she grew heated, he reacted by grabbing the back of Baxter's seat and shaking it violently. As he did so, Wenick directed several profanities at Baxter, and when she asked if he intended to strike her, Wenick said, "I would, but . . . you are worthless." **See** Trial Court Opinion, 5/11/2021, at 7.

Finally, Baxter testified concerning the incident which precipitated her petition for a PFA order on February 17, 2021. By that time, the custody

proceedings had begun,[1] and the trial court had ordered Wenick not to directly contact Baxter or G.H. Instead, Wenick had to communicate with Wenick through a secure online application called Our Family Wizard. Nevertheless, on the above date, Wenick appeared without advance notice at Baxter's place of work in Jamestown, New York, and called her cellular phone. He also left voice messages which Baxter did not respond to. When Baxter began her drive home that night, someone in an unknown vehicle drove past her while repeatedly flashing the headlights and honking the car horn.

Later that evening, Baxter contacted Wenick through Our Family Wizard. Baxter learned that Wenick had been the motorist who had accosted her, and that he had been attempting to schedule a visit with G.H. Baxter testified that Wenick's conduct had greatly alarmed her because he had flouted the terms of the custody order as to how and when he could contact her and make visitation arrangements.

Wenick gave a very different account as to the nature of his interactions with Baxter. He testified that he did not grab Baxter's wrists in 2019 as she had alleged, and that he had only tried to warn Baxter against the stress of custody proceedings by pointing out figuratively that, "people kill each other

---

[1] Baxter and Wenick stipulated to a custody order in December 2020 which afforded Wenick the right of unsupervised custody, but this right was contingent on Wenick using the mandated channels to make the necessary arrangements with Baxter.

in court." Evidentiary Hearing Transcript, 3/3/2021, at pp. 72-73. He also denied that the other episodes in 2019 ever took place.

As to the Jamestown incident on February 17, 2021, Wenick claimed that he was living in California at the time, and that he and Baxter had communicated extensively about scheduling a visit with G.H. in Pennsylvania. When Wenick arrived in Pennsylvania as planned, he was unable to get in touch with Baxter, so he rented a car and drove to Jamestown, New York, where Baxter worked. According to Wenick, he was upset about having incurred the expense of his trip and the risk of a Covid-19 infection, insisting that the incident in Jamestown only occurred because he was desperate to see his child.

Largely finding Wenick's testimony not credible, the trial court entered a final PFA order restricting Wenick's contact with Baxter for a period of three years. However, the trial court denied the portion of Baxter's petition seeking additional contact restrictions between Wenick and G.H. because the child had never been harmed or in danger from harm during the subject incidents.[2]

Wenick timely appealed, and in his appellate brief, he raises two issues for our consideration:

> 1. Whether the [trial] court erred in granting [the final PFA order] against [Wenick] although he did not cause physical injury or

---

[2] Baxter does not appeal the scope of the final PFA order, and the partial denial of her petition is not now at issue.

place [Baxter] in reasonable fear of serious bodily injury or sexual assault?

2. Whether the [trial] court erred in granting a protection from abuse order when it lacked jurisdiction over the matter?

Appellant's Brief, at 7 (suggested answers omitted).

After a thorough review of the record, the briefs of the parties, the applicable case law, and the well-reasoned opinion of the trial court, which comprehensively discusses and properly disposes of the questions presented, we find that the trial court did not err in granting the final PFA order.

Wenick's second appellate issue is that the trial court lacked jurisdiction. He argues in his brief that the trial court had no authority to enter the final PFA order because he resides in another state, not all the incidents giving rise to the order occurred in Pennsylvania, and the order does not relate to the underlying custody dispute that was the initial basis for the trial court's jurisdiction.

However, a trial court in this Commonwealth "may exercise personal jurisdiction over a person who acts directly . . . as to a cause of action or other matter arising from such person causing harm or tortious injury by an act or omission in this Commonwealth." 42 Pa.C.S. § 5322(a)(3). "Exclusive, continuing jurisdiction over child custody matters is conferred by 23 Pa.C.S. § 5422(a) on the court which has made an initial custody determination and endures until the child's connection with the Commonwealth is severed." **B.T.W. ex rel T.L. v. P.J.L.**, 956 A.2d 1014, 1016 (Pa. Super. 2008). "[A]n

action for protection from abuse may be brought in a county in which (1) the plaintiff resides, either temporarily or permanently, or is employed, or (2) that defendant may be served, or (3) the abuse occurred." 231 Pa. Code Rule 1901.1(a).[3]

In this case, the initial custody order as to G.B. was entered in 2020 by stipulation of the parties in Warren County, Pennsylvania. The alleged instances of abuse were related to those custody proceedings.[4] Accordingly, the trial court properly exercised jurisdiction over the parties at the outset, and thereafter retained jurisdiction because the connection between G.H. and the Commonwealth had not been severed. *See* 42 Pa.C.S. §§ 5322(a)(3), 5422(a).

Additionally, because several of the alleged incidents prompting the final PFA order occurred in Pennsylvania and Baxter has resided in Warren County, Pennsylvania, at all relevant times, her action for protection from abuse was properly brought in that forum. *See* 231 Pa. Code Rule 1901.1(a).

---

[3] A child custody proceeding is defined as "a proceeding in which legal custody, physical custody or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear." 23 Pa.C.S. § 5402.

[4] The temporary PFA order identified the child as a protected party, and the final PFA order directed that all communication between Wenick and the child would have to made via the online application, Our Family Wizard. The PFA proceedings were, therefore, related to the underlying custody proceedings.

As to the merits, Wenick contends that there was an insufficient factual basis for the final PFA order because Baxter was not subject to "abuse" for the purposes of the Protection From Abuse Act, 23 Pa.C.S. §§ 6101-6122. The term is defined in pertinent part as follows:

> (1) Attempting to cause or intentionally, knowingly, or recklessly causing bodily injury, serious bodily, injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault, or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> * * * *
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person without proper authority, under circumstances which place the person in reasonable fear of bodily injury.

23 Pa.C.S. §6102(a).

In its opinion, the trial court fully detailed four incidents which could have reasonably put Baxter in fear of serious bodily injury. *See* Trial Court Opinion, 5/11/2021, at 6-9. She was at various times choked, grabbed, verbally threatened and harassed by Wenick. Even if Baxter did not sustain serious physical injury due to those interactions, they were certainly enough to put her in fear of serious bodily injury.

Wenick contends Baxter's allegations against him are fabricated, misinterpreted or simply exaggerated versions of what really transpired. Yet, to the extent that Wenick's own testimony differed from that of Baxter, we

are bound by the trial court's determination that Baxter's account was the more credible of the two.[5] Thus, the trial court did not abuse its discretion in finding that the final PFA order was warranted.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/2022

---

[5] The purpose of the PFA Act is to protect victims of domestic violence from those who perpetuate such abuse, with the primary goal being the prevention of physical and sexual abuse. ***Buchhalter v. Buchhalter***, 959 A.2d. 1260, 1262 (Pa. Super. 2008); ***see also*** 23 Pa.C.S. § 6108 (enumerating forms of relief availing under the Act). "A PFA order may be justified if the trial court finds that it is supported by a preponderance of evidence." ***K.B. v. Tinsley***, 208 A.3d.123, 128 (Pa. Super. 2019). The trial court's exclusive role as the finder of fact is to assess the demeanor and credibility of witness testimony. ***See C.H.L. v. W.D.L.***, 214 A.3d 1272, 1276-77 (Pa. Super. 2019). When reviewing the propriety of a PFA order, an appellate court applies an abuse of discretion standard and must defer to the trial court's credibility determinations. ***Id***. All record evidence must be viewed in the light most favorable to the party for whom a PFA order was granted. ***Id***.

IN THE COURT OF COMMON PLEAS
OF THE 37ᵀᴴ JUDICIAL DISTRICT OF PENNSYLVANIA
WARREN COUNTY BRANCH
CIVIL DIVISION

KRISTA J. BAXTER,

    Plaintiff,

    v.

                             A.D. 76 of 2021

ELIYAHOU WENICK,

    Defendant.

**MEMORANDUM OPINION PURSUANT TO Pa. R.A.P. 1925(b)**

Before the Court are Defendant's Notice of Appeal and Concise Statement of the Errors

Complained of on Appeal filed in response to this Court's Final Protection from Abuse ("PFA")

Order granting, in part, the Petition filed by Plaintiff.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff and Defendant were in a relationship for a year and a half and never married.

They are parents to G.B., born in June 2019, and lived together in Arizona until their separation

in September 2019, with Plaintiff and G.B. returning to Pennsylvania to reside with Plaintiff's

parents.

On February 19, 2021, Plaintiff filed a Petition for PFA on behalf of herself and G.B. as

against Defendant on grounds that as the most recent incident of abuse, where Defendant, who

currently resides in California, drove past Plaintiff as she was leaving work in Jamestown, New

York, rapidly flashing his headlights and honking his horn. Plaintiff also described an alleged

history of past abuse, including an incident in 2019 where Defendant grabbed Plaintiff's wrist

and threatened to "kill her in court", an incident in a vehicle while Plaintiff was driving, where

1

Defendant grabbed her by the shoulders and shook her aggressively with G.B. present, an incident where Defendant left a used dildo and lubrication in a bag given to Plaintiff with a note stating, "This is how (G.B.) was made", and numerous incidents where Defendant verbally abused Plaintiff.

Following an *ex-parte* hearing held on February 19, 2021, presided over by President Judge Maureen A. Skerda, a Temporary PFA Order was entered. The PFA hearing was held on March 3, 2021, presided over by Judge Gregory J. Hammond, where Plaintiff's PFA Petition was granted as to herself and denied as to G.B.[1] The Final PFA Order was entered on March 3, 2021, to be effective for three (3) years.

## DISCUSSION

Defendant raises four (4) issues on appeal: (1) whether the trial court had jurisdiction to enter a PFA order; (2) whether the trial court erred in determining there was sufficient evidence of abuse to enter a PFA order; (3) whether the trial court erred in finding that Defendant contradicted himself in his testimony at the time of hearing; and (4) whether the trial court erred in determining that Defendant's testimony was not credible.[2]

The first issue presented asserts that the trial court lacked jurisdiction over the instant PFA matter because: (1)"the alleged incident which precipitated Plaintiff's filing of the PFA Petition occurred in Jamestown, New York" and (2) "most of the other alleged incidents occurred in Arizona."[3] To begin, Plaintiff and G.B. are residents of Pennsylvania, while Defendant is a resident of California. The parties formerly resided in Arizona together until

---

[1] As the Court indicated at the conclusion of the hearing, no incidents involving the parties' minor child were alleged to have occurred after the Custody Order was entered by stipulation in December 2020, whereby Defendant was granted unsupervised periods of custody. The allegation that the child had slipped off Defendant onto the floor did not amount to abuse.

[2] Issues reordered for ease of disposition.

[3] Defendant's Concise Statement at 1.2.

2

September 2019, when Plaintiff and G.B. returned to Pennsylvania to reside with Plaintiff's parents. The Court relied on four (4) incidents in support of its decision. First, the incident for which the PFA was initially filed, where on February 17, 2021, as Plaintiff was leaving work in Jamestown, NY, Defendant drove past her repeatedly honking the horn and flashing his headlights at her. He then repeatedly messaged her through the Our Family Wizard application requesting to see G.B. and told Plaintiff that he had driven by her. *PFA Transcript, Mar. 3, 2021 at 8:9-25 to 9:1-14*. Secondly, Plaintiff described an incident which occurred in Arizona in early 2019, where Defendant "slowly started to put pressure on (Plaintiff's) neck and start(ed) strangling (her)." *Id at 18:1-5*. Next, Plaintiff described an incident which occurred in her parent's home in Warren, Pennsylvania in the Fall of 2019, where Defendant "grabbed (her) when (they) were alone, very, very, very hard and pulled (her) toward him by the wrist. And he said, I am going to kill you in court. And he wouldn't let (her) go." *Id at 11: 20-25*. Finally, Plaintiff described another incident which occurred at her parent's home in Warren, Pennsylvania in the Fall of 2019, where Plaintiff was driving out of her parent's driveway with Defendant and G.B. in the back seat where Defendant "Grabbed (Plaintiff) and the back of the car seat and he started shaking (her) aggressively. And he called me all sorts of profanities." *Id at 12: 1-5*.

The Court clearly has jurisdiction with respect to the third and fourth incidents described above as they occurred in Pennsylvania, although Defendant is a resident of California. Pursuant to 23 **Pa. C.S.A. §6103(b)(2)**, jurisdiction is not affected by "defendant's non-residence in this Commonwealth, provided that the court has personal jurisdiction over the defendant in accordance with 42 Pa. C.S. §5322." Pursuant to **42 Pa. C.S.A. §5322(a)(3)**, "A tribunal of this Commonwealth may exercise personal jurisdiction over a person who acts directly...as to a

3

cause of action or other matter arising from such person causing harm or tortious injury by an act or omission in this Commonwealth." With respect to the first incident, which occurred in New York and the second incident, which occurred in Arizona, the Court still has jurisdiction even though these acts occurred outside of Pennsylvania and Defendant is a resident of California. "Exclusive, continuing jurisdiction over child custody matters is conferred by 23 Pa. C.S.A. §5422(a) on the court which has made an initial custody determination and endures until the child's connection with the Commonwealth is severed." **B.T.W. ex rel T.L. v. P.J.L.**, 956 A.2d 1014, 1016 (Pa. Super. 2008). Pursuant to **23 Pa. C.S.A. §5402**, a child custody proceeding is defined as, "a proceeding in which legal custody, physical custody or visitation with respect to a child is an issue. The term includes a proceeding for divorce, separation, neglect, abuse, dependency, guardianship, paternity, termination of parental rights, and protection from domestic violence, in which the issue may appear." In the present matter, President Judge Maureen A. Skerda entered a custody Order, upon stipulation of the parties, in December 2021.[4] Plaintiff and G.B. continue to reside in Pennsylvania and as such, this Court has exclusive, continuing jurisdiction over child custody matters. The present PFA action involved several custody issues: (1) G.B. was an alleged victim; (2) a temporary PFA order granted sole custody to Plaintiff; (3) this Court's final PFA Order modified Judge Skerda's custody Order to only allow communication through the Our Family Wizard application. "Thus, the hearing on Appellee's request fails directly under the aegis of the statutory definition, and the court's authority to enter the order under review is clearly established." **B.T.W ex rel T.L. v. P.J.L** at 1016. As the Court

---

[4] The Court is taking judicial notice of the custody action and temporary PFA with respect to the issue of jurisdiction. As such, this Court will have the record from both actions transmitted to the Superior Court to form a complete record.

has exclusive, continuing jurisdiction over the parties' custody matters and the present PFA action involved custody issues, this Court clearly had jurisdiction to enter the Final PFA Order.

The second issue presented asserts that the trial court erred in determining there was sufficient evidence of abuse to enter a PFA order because Defendant did not cause physical injury or place Plaintiff in reasonable fear of serious bodily injury or sexual assault. Pursuant to 23 Pa. C.S.A. §6102(a), the term "abuse" in the context of a PFA is defined in pertinent part as follows:

> (1) Attempting to cause or intentionally, knowingly, or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault, or incest with or without a deadly weapon;
>
> (2) Placing another in reasonable fear of imminent serious bodily injury; and
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person without proper authority, under circumstances which place the person in reasonable fear of bodily injury.

While Defendant avers that he neither caused physical injury nor placed Plaintiff in reasonable fear of physical injury, "[t]he PFA act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." E.K. v. J.R.A., 237 A.3d 509, 519 (Pa. Super. 2020) (citing K.B. v. Tinsley, 208 A.3d 123, 128 (Pa. Super. 2019)). A "preponderance of the evidence standard is defined as the greater weight of the evidence, i.e. [enough] to tip a scale slightly." Id at 519 (citing Raker v. Raker, 847 A.2d 720, 724 (Pa. Super. 2004). "The Court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury." Id (citing Raker, 847 A.2d at 725.) In making this determination, the Court can rely on

5

testimony regarding past acts of abuse as they are "significant in determining the reasonableness of a PFA petitioner's fear." Id (*citing* K.B., 208 A.3d at 128).

Plaintiff testified to four (4) significant acts of abuse which caused her physical injury and/or placed her in fear of physical injury. The first event occurred in Arizona in early 2019 where Defendant choked Plaintiff while she was pregnant. "I thought he was just like holding my neck. And he slowly started to put pressure on my neck and start strangling me." *PFA Tr. at 18:3-5*. This was one of the early incidents of abuse which ultimately led Plaintiff to leave Arizona and return to her parents' home in Pennsylvania. "He saw me get really, like emotional. And he stopped. And it was the, a very peculiar incident. Like, I have never had anybody look at me like that before." *Id at 18:6-9*. Not only did Defendant cause bodily injury by strangling Plaintiff, but he also placed her in fear of serious bodily injury.

The second incident occurred in Pennsylvania in late 2019 where Defendant grabbed Plaintiff by the wrist and threatened her in her parents' home. "He grabbed me when we were alone, very, very, hard and pulled me toward him by the wrist. And he said, 'I'm going to kill you in court.' And he wouldn't let me go." *Id at 11:22-25*. At the time Defendant made this threat to Plaintiff, there was no active custody action. Defendant's PFA counsel opined that this was Defendant's way of telling Plaintiff that he was going to file a custody action against her. However, Plaintiff testified that she did not know what Defendant meant by his statement and that he was aggressive when he made it. *Id at 32:16-19 to 33:2-5*. This event caused Plaintiff to contact the Safe Place where she received counseling sessions for two (2) months. *Id at 48:4-11*. Further, this event caused Plaintiff to contact the Pennsylvania State Police and file charges against Defendant. *Id at 48:12-25*. Defendant not only caused bodily injury by aggressively

6

grabbing Plaintiff by the wrist, but he placed her in such fear of serious bodily injury that she filed a police report and also had to participate in counseling to deal with this fear.

The third incident occurred in Pennsylvania in late 2019 where Defendant aggressively shook Plaintiff while grabbing the back of her seat while she was driving her vehicle. Plaintiff was actively backing out of her parents' driveway while Defendant was in the back seat with G.B. Plaintiff and Defendant were having a discussion when Defendant grabbed the back of Plaintiff's car seat and Plaintiff herself and began shaking them both aggressively. *Id at 12:2-9.* Further, during this shaking incident, with his infant child sitting beside him, Defendant repeatedly called Plaintiff a "stupid, fucking bitch", a "fucking bitch", and "stupid". *Id at 49:8-10.* Once the shaking ceased, Plaintiff asked Defendant if he was going to hit her and Defendant responded by saying, "I would, but…you are worthless." *Id at 12:12.* While Plaintiff was clearly placed in enough fear of serious bodily injury that she directly asked Defendant if he was going to hit her, she did not report this incident to police and did not file a PFA petition at that time. "A PFA petitioner is not required to file a police report, nor is it necessary for her to introduce medical evidence of an injury." Diaz v. Nabiyev, 235 A.3d 1270, 1273 (Pa. Super. 2020) (*citing* Hood-O'Hara v. Wills, 873 A.2d 757, 760 (Pa. Super. 2005)). Plaintiff's testimony regarding Defendant aggressively shaking her while she was driving caused her physical injury and it also caused Plaintiff to be in fear of substantial physical injury to the point where she directly asked Defendant during this altercation if he was going to hit her.

The fourth incident precipitated the filing of the instant PFA action where Defendant drove past Plaintiff as she was leaving work and repeatedly flashed his lights and honked his horn at her. While this event may sound harmless on the surface, when taken into context with the pending custody action, Defendant's inability to follow this Court's current custody order,

7

and the past history of abuse, it is clear that Plaintiff's reasonable fear of serious physical injury was justified. On February 17, 2021, Plaintiff was at her place of work in Jamestown, New York. At 3:00 p.m. Plaintiff pulled out of the parking lot to take her lunch break. As she was pulling out of the parking lot, she received a call from Defendant, which she did not answer. *Id at 8:9-18*. Plaintiff finished work at 6:00 p.m. and entered her car located in the parking lot where she stayed until 7:00 p.m. after finishing a phone session with her therapist. About a block away from her place of work, as Plaintiff was driving towards her home, she was passed by an unknown vehicle with the driver waving at her, continuously honking the horn and flashing the lights at her. *Id at 8:20-23*. Plaintiff then received a phone call from Defendant through the Our Family Wizard application, which she did not answer and she also received a message from Defendant where he stated, "You just passed me in Jamestown, can you please have a heart and let me see my son?" *Id at 43:4-6*. Plaintiff did not respond to the message because she was "freaked out". *Id at 45:1-3*. When Plaintiff arrived home she sent a message to Defendant through the Our Family Wizard application where she told him that G.B. was sleeping and that "maybe tomorrow would be a better day to video call with him." *Id at 9:2-6*. Defendant then responded to Plaintiff and his responses made her think that he didn't like that very much. *Id at 9:7-8*. G.B. awoke around 9:00 p.m. that evening and as soon as he awoke, Plaintiff received a video call from Defendant and through the application's message previewing capabilities, Plaintiff could see that Defendant was calling from his vehicle. *Id at 9:1-4*. The video call went unanswered.

As of the date of the most recent incident, the parties' current custody order has a provision regarding contact between Defendant and G.B. while in Warren County. Defendant is supposed to give Plaintiff at least ten (10) days' notice regarding his requested periods of

8

visitation with G.B. Defendant is supposed to let Plaintiff know where he will be staying while in Warren County as well as the specific dates and times. The parties are to mutually agree to periods of time for visitation. *Id at 53:1-23.* Defendant had contacted Plaintiff several days prior to his arrival in Pennsylvania. At no time did Defendant ever give Plaintiff a set date that he would be arriving in Pennsylvania nor did he give a set date that he would be leaving. Further, Defendant never gave Plaintiff a firm answer as to where he would be staying while in town. Defendant had several hotels where he wanted to stay, but every time he spoke to Plaintiff, he changed his mind. "I don't remember how many times he went back and forth." *Id at 29:11-12.* While Plaintiff and Defendant had been in communication several days prior to the February 17th incident, Plaintiff was never given the appropriate ten (10) days' notice of when Defendant would be in town and where he would be staying, pursuant to their custody order. Plaintiff testified that she wouldn't not commit to firm plans with Defendant regarding visitation with G.B. because he had not followed the explicit rules of the custody order. Plaintiff was not opposed to Defendant spending time with G.B., but she simply requested that he do it the right way. "I would confirm on a firm time if he followed the Court Order." *Id at 29:24-25.* Because Plaintiff was unsure of when Defendant was actually going to be in town, she had every right to be frightened by Defendant's message stating that he just passed her on the road, especially when he had startled her by flashing his lights and honking his horn at her, knowing full well she would not have been able to recognize him in his rental vehicle. While Plaintiff and Defendant did not meet face to face in this current incident, she was placed in reasonable fear of serious bodily injury based on past abusive incidents. "Past abusive conduct on the defendant's part is a crucial inquiry necessary for entry of a proper order." E.K., 237 A.3d 509 at 522 (*citing* Custer v. Cochran, 933 A.2d 1050, 1059, n.11 (Pa. Super. 2007)). Defendant's incessant messaging

9

and begging to see G.B. coupled with his history of physical abuse during moments of frustration led Plaintiff to reasonably fear serious bodily injury at this time because of her several prior experiences with Defendant's physical abuse. "Because the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply, and past acts are relevant to determine the reasonableness of the petitioner's current fear." E.K., 237 A.3d 509 at 522 (*internal citations omitted*). While Plaintiff and Defendant did not have any physical contact during this incident, Defendant's past pattern of abuse, detailed *supra*, has established an ongoing pattern of abuse which would easily cause Plaintiff to be in reasonable fear of serious bodily injury.

The third issue presented is that the trial court erred in finding that Defendant contradicted himself in his testimony at the time of hearing. Specifically, Defendant avers that the Court's questions regarding which hotels he intended to and/or actually stayed at during his visit to Pennsylvania in February 2021 were irrelevant to the instant PFA. "Credibility of the witnesses and the weight accorded their testimony is within the exclusive province of the judge as fact finder." Mescanti v. Mescanti, 956 A.2d 1017,1019-20 (Pa. Super. 2008). Further, the Court must view "the evidence in the light most favorable to petitioner and granting her the benefit of all reasonable inferences." C.H.L. v. W.D.L., 214 A.3d 1272,1277 (Pa. Super. 2019). Defendant's counsel first elicited testimony from him regarding hotels in an attempt to show that Defendant had inadvertently encountered Plaintiff on her way home from work. The Court found this testimony to be relevant because the Court determined this convoluted testimony to be a cover for Defendant's actions of harassing and stalking Plaintiff on February 17, 2021.

Pursuant to this Court's custody order, Defendant is to give Plaintiff ten (10) days' notice prior to any periods of physical custody with G.B. In addition to this notice, Defendant must let

Plaintiff know where he will be staying during his visit. Defendant avers that he gave Plaintiff notice of the dates of his intended visit as early as February 3, 2021. *PFA Tr. at 58:23-25.* However, Defendant never told Plaintiff where he would be staying while in town. "I explained to her that I don't have a place yet. On February 11th or February 12th, I made her aware that I have two places that its down to." **Id at 59: 5-7.** When Defendant was asked by Plaintiff's counsel which two places he was considering staying, Defendant was unable to give an actual answer. Defendant described the first possible location as follows: "The general area if I remember correctly, was, its, its, it was like in, in…and it was, and the and the number on picture was 42…Didn't get an address. But, it was near, the train tracks run back of it." **Id at 77:13-17.** When asked about the second possible location, Defendant could not recall the name of the hotel or whether it was located in Pennsylvania or New York. *Id at 77:22-25 to 78:1-8.* Based upon Defendant's testimony, it is clear to the Court that Defendant did not have a secured reservation at any location and that Plaintiff had no idea where Defendant would be staying during his visit.

The following is the clearest timeline and explanation the Court has been able to decipher from Defendant's testimony regarding the circumstances surrounding his interaction with Plaintiff on February 17, 2021. Defendant flew into Buffalo, New York on February 16, 2021 at 10:45 p.m. and stayed overnight in a hotel by the airport. On February 17, 2021, Defendant rented a vehicle in Buffalo and arrived at the Hampton Inn in Warren, Pennsylvania between 5:30 p.m. and 5:45 p.m. *Id at 63:2-10.* Defendant called Plaintiff, who did not answer, and waited at the Hampton Inn for, "at least an hour to an hour and a half." **Id at 63: 24-25.** Defendant neither had a reservation at the Hampton Inn nor did he have any intention of staying there as he had a meeting the next morning with his attorney in Erie. He inquired about pricing, determined it to be too expensive, then filled out an application for a summer job, even though

11

he currently lives in California. *Id at 80: 1-8.* Since Defendant did not receive a response from Plaintiff, he decided, "Hey, I am tired. I have been traveling. Let me just decide whether or not I am going to stay in my regular place where I would like to at the Harbor Hotel or I will drive to Erie." *Id at 64:11-15.* Around 6:30 p.m. or 6:45 p.m. Defendant left the Hampton Inn in Warren and drove towards the Harbor Hotel in Celoron, New York. During this drive from Warren to Celoron, Defendant encountered Plaintiff on the road in Jamestown. "Approximately 7:17, 7:18 p.m., I was, I, I am, I was by Fairmount and 8th Street. I was just crossing the bridge." *Id at 64:23-25 to 65:1.* "As I was coming up to the stop sign, I see Krista's car coming down...so I got excited...So I honked the horn, And so, and that's it. I realized that she did not see me. So, I actually called. And then I also sent a message on Our Family Wizard." *Id at 65: 5-14.* From Defendant's testimony, it appears that he drove through Jamestown, randomly spotted Plaintiff as she was leaving work, stopped in at the Harbor Hotel in Celeron, then ended up at a Hotel Six in Erie around 9:15 p.m. When asked why he didn't stay at the Harbor Hotel as was his plan when he left the Hampton Inn, Defendant responded:

> "It's very simple. Every time I come to town, I like to stay at the Harbor Hotel. They are nice to me. They give me a discount. So after, after I didn't hear back from Krista, and I was at the Hampton Inn, I decided, to go to go to Erie. But, let me check in with the Hampton Inn. And see maybe they will give me a good rate. Because I was tired. So, on my way to Erie I stopped, I stopped into the Harbor Hotel."

*Id at 81:4-12.* Defendant was questioned several times regarding this timeline and each time he responded with a different more confusing answer. The Court finds that Defendant's testimony regarding his journey to find a hotel for the night is relevant because it was during this journey that he interacted with Plaintiff and that interaction is the basis of the instant PFA action. Further, the Court finds that Defendant's testimony was contradictory from beginning to end.

12

The fourth and final issue presented is whether the trial court erred in determining that Defendant's testimony was not credible because Defendant did not contradict himself. "Credibility determinations are crucial components to any trial proceeding. The trial court's ability to view the petitioner's facial expressions and mannerisms during the *ex parte* hearing is critical to an ability to render its credibility determinations." Ferko-Fox v. Fox, 68 A.3d 917, 924 (Pa. Super. 2013). While the Court has already determined that Defendant contradicted himself numerous times during his testimony regarding his hotel search, this was not the only area of credibility determination assessed by the Court. In the instant matter, Defendant's testimony throughout its entirety was erratic, non-responsive, and at times bizarre. When the Court asked Defendant if he gave Plaintiff specific notice about where he would be staying in Erie, Defendant responded, "I have a, can I pull my reference sheet? On, on, on, the 16th, when I came in and the morning of the 17th, I said I would like to see my son." *Id at 86:11-20*. When the Court asked Defendant how long he was planning on being in town during his February 2021 visit, Defendant's contradicted himself several times. "Originally I would stay for a month or two months, because I was hoping to find a place...and part of my reason here to stay was to find a place. And because I want to move part time over here." *Id at 92:9-15*. "When I came into Erie, and my attorney, I notified him that I am not going to be here for a month...Its actually going to be only two weeks. Okay. And, and...and then I said, hey, I want a month of about going back and forth. So probably, amicably better if I stay here for two weeks." *Id at 93:5-22*. The Court stated a lengthy verbal opinion on the record to support its findings that Plaintiff proved by the preponderance of the evidence that abuse had occurred. The Court also addressed the issue of credibility, first addressing Defendant's testimony. "It's the first time I've met him and he wasn't making any sense. He was pressured. He was contradictory. Didn't make any

13

sense. Answered questions that weren't asked of him. And was scattered." *Id at 115:3-8*. In discussing Plaintiff's credibility, the Court stated, "based on credibility alone, I believed the Plaintiff's version of those events." *Id at 117:22-24*. As the Court makes credibility determinations of witnesses at PFA hearings, and this Court placed those determinations, and the reasons for them on the record, the Court did not err in finding Defendant was not credible.

## CONCLUSION

No further Opinion shall issue.

BY THE COURT:

GREGORY J. HAMMOND, J.